UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CNY FAIR HOUSING, INC.,

                             **Plaintiff,**

  vs.                                                     5:21-CV-1217
                                                                (MAD/ML)

SWISS VILLAGE, LLC, THE ALPS
AT SWISS VILLAGE, LLC, and
JILL BUTLER,

                              **Defendants.**
_____

**APPEARANCES:**                                     **OF COUNSEL:**

**CNY FAIR HOUSING, INC.**               **CONOR J. KIRCHNER, ESQ.**
731 James Street, Suite 200              **MATTHEW CASEY WEISSMAN-**
Syracuse, New York 13203               **VERMEULEN, ESQ.**
Attorneys for Plaintiff

**BARCLAY DAMON LLP**                  **EDWARD G. MELVIN, ESQ.**
Barclay Damon Tower                      **ROSS M. GREENKY, ESQ.**
125 East Jefferson Street
Syracuse, New York 13202
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      Plaintiff CNY Fair Housing, Inc. commenced this action on November 10, 2021, against Defendants Swiss Village, LLC ("Swiss Village"), The Alps at Swiss Village, LLC ("The Alps"), and Jill Butler ("Butler") for violations of the Fair Housing Act of 1968 ("FHA") and New York State Human Rights Law ("NYSHRL").  *See* Dkt. No. 1.  Currently before the Court is Defendants' pre-answer motion to dismiss the complaint.  *See* Dkt. No. 15.  For the reasons that follow, Defendants' motion to dismiss is denied.

## II. BACKGROUND

According to Plaintiff's complaint, Swiss Village and The Alps are domestic limited liability companies with their principal offices located in DeWitt, New York. *See* Dkt. No. 1 at ¶¶ 9-10. Swiss Village owns and manages Swiss Village Apartments, a 201-unit apartment complex located in DeWitt, and The Alps owns and manages The Alps at Swiss Village, a 30-unit apartment complex located adjacent to the Swiss Village Apartments. *See id.* Defendant Butler is a leasing agent for Swiss Village and The Alps. *See id.* at ¶ 11. Butler's duties include responding to inquiries from prospective tenants, approving rental applications, and executing leases on behalf of the other Defendants. *See id.* Plaintiff is a non-profit organization incorporated under New York State law who is "dedicated to eliminating housing discrimination, promoting open communities, and ensuring equal access to housing opportunity for all people in Central and Northern New York." *Id.* at ¶ 5.

In May 2019, a client of a nonparty organization named Rescue Mission Alliance ("RMA"),[1] called Swiss Village Apartments to inquire about available apartments. *See id.* at ¶ 12. The client's primary language was Spanish, so an RMA caseworker took over the call after the client had difficulty communicating with the rental agent who answered the phone. *See id.* The rental agent then asked the RMA caseworker whether his client would have an English-speaking individual living with the client. *See id.* When the RMA caseworker responded that the client would not, the rental agent told the RMA caseworker that his client would need to live with someone who speaks English in order to rent at Swiss Village Apartments. *See id.* The RMA caseworker explained that he was bilingual and would be available to assist with translation or

---

[1] RMA "is a non-profit organization that provides emergency shelter, clothing, meals, supportive permanent housing, employment and education resources, life skills training, and spiritual care to individuals in need." Dkt. No. 1 at ¶ 12 n.1.

interpretation as needed, but the rental agent insisted that the client must live with an English-speaking individual, and the call ended shortly thereafter. *See id.*

The RMA caseworker then informed Plaintiff that Swiss Village Apartments had refused to rent to his client based on her limited English proficiency ("LEP"). *See id.* at ¶ 13. In response, Plaintiff determined that it would conduct "audit testing"[2] on Defendants "to confirm whether Defendants refused to rent to prospective tenants with [LEP] or otherwise treated individuals differently based on their ability to speak English." *Id.* at ¶¶ 14-15. Plaintiff decided that it would have two testers pose as representatives of theoretical LEP tenants, and a third tester pose as a theoretical tenant who could speak English fluently. *See id.* at ¶ 18.

On June 4, 2019, the first tester ("Tester 1") called Swiss Village Apartments and spoke with a rental agent who identified herself as "Jill." *Id.* at ¶ 19. Plaintiff believes that "Jill" was Defendant Butler. *See id.* Tester 1 informed Butler that she was a caseworker who was calling on behalf of a Spanish-speaking female client with LEP. *See id.* Butler then "interrupted" the caseworker to ask whether her client "would have someone on the lease with her that would be English-speaking," and added that "if [the client did] not, we would not be able to lease to her." *Id.* Butler explained that the lease was a "16-page legal document … that [the client] would have to sign" and told the caseworker that Butler "would have to know that [the client] knows how to read that." *Id.* Butler also asserted that she needed to be able to communicate with the client about the rental application and about work orders or any issues with the apartment. *See id.* Finally, before the call ended, Butler reiterated her requirement that the client would "have to

---

[2] In pursuit of its mission, Plaintiff conducts audit testing of housing providers and hires individuals "who pose as renters, homebuyers, or representatives of such individuals, including housing caseworkers, for the purpose of obtaining information about the conduct of landlords, property managers, real estate companies and agents, and others to determine whether illegal housing discrimination is taking place." Dkt. No. 1 at ¶ 7.

3

always have somebody that is going to be either an occupant or a leaseholder that would be able to speak English so they can communicate with us … . It would have to be someone that actually lives in that apartment with her." *Id.* at ¶ 20.

On August 21, 2020, the second tester ("Tester 2") called Swiss Village Apartments and spoke with a rental agent who identified herself as "Michele." *Id.* at ¶ 22. Tester 2 only inquired about the availability of two-bedroom apartments. *See id.* The rental agent provided Tester 2 with rental information and the call ended shortly thereafter. *See id.*

On August 24, 2020, the third tester ("Tester 3") called Swiss Village Apartments and spoke with a rental agent who identified herself as "Jill." *Id.* at ¶ 23. Plaintiff believes this person was Defendant Butler. *See id.* Tester 3 initially asked about the availability of two-bedroom apartments and received similar rental information as Tester 2. *See id.* Butler then asked Tester 3 if the apartment would be for herself or for someone else. *See id.* Tester 3 told Butler that she was a caseworker, and that she was looking for an apartment on behalf of clients who had recently immigrated and did not speak English well. *See id.* Butler responded by stating that there must be an adult who can speak and read English living in the apartment to act as a translator. *See id.* Like with Tester 1, Butler added that "the lease is sixteen pages of English, and they have to be able to read that and they have to be able to read the application and we have to have someone that lives in that house that's able to verify that they can translate that for them." *See id.* Tester 3 responded that she could help translate for her clients, but Butler interrupted and stated "but you would have to actually live in the apartment." *See id.* The call ended shortly thereafter.

The complaint alleges that Defendants' English language policy disproportionately and unjustifiably impacted prospective tenants on the basis of their national origin and race. Specifically, the complaint analyzes "[United States] Census Bureau data on [LEP] by nativity and race" and concludes that: (1) foreign-born residents of the Town of DeWitt "are more than 500

4

times more likely than native-born residents to be excluded by Defendants' language policy"; (2) foreign-born residents of the City of Syracuse "are more than 26 times more likely than native-born residents to be excluded by Defendants' language policy" and "Asian, Hispanic, and Black residents in the City of Syracuse are 18.6, 10.5, and 1.7 times more likely, respectively, than non-Hispanic White residents to be excluded by" Defendants' language policy; (3) foreign-born residents of Onondaga County "are over 50 times more likely than native-born residents to be excluded by Defendants' language policy" and "Asian, Hispanic, and Black residents in central and northern Onondaga County are ... 25.9, 14.0, and 2.1 times more likely, respectively, than non-Hispanic White residents to be excluded" by Defendants' language policy; and (4) foreign-born residents of the entire Syracuse metropolitan statistical area are "nearly 60 times more likely than native-born residents to be excluded by Defendants' language policy." *Id.* at ¶¶ 25-33.

The complaint asserts two causes of action. The first alleges that Defendants violated the FHA when they unlawfully refused to rent or negotiate for the rental of a dwelling because of national origin and race, *see* 42 U.S.C. § 3604(a); discriminated against Plaintiff in the terms, conditions, or privileges of rental of a dwelling because of national origin and race, *see id.* § 3604(b); and made statements that indicated a preference, limitation, or discrimination based on national origin and race, *see id.* § 3604(c). The second alleges that Defendants violated the NYSHRL when they unlawfully refused to rent or unlawfully denied a housing accommodation because of national origin and race, *see* N.Y. Exec. Law § 296(5)(a)(1); discriminated against Plaintiff in the terms, conditions, or privileges of rental of a dwelling because of national origin and race, *see id.* § 296(5)(a)(2); and made statements that indicated a preference, limitation, or discrimination based on national origin and race, *see id.* §§ 296(5)(a)(3), 296(5)(c)(2). Plaintiff seeks (1) a declaration that Defendants violated the FHA and NYSHRL; (2) a permanent injunction preventing Defendants from engaging in similar conduct in the future; (3)

5

compensatory and punitive damages; and (4) attorney's fees and costs.

Defendants now argue that the complaint must be dismissed because (1) a prospective tenant's language or LEP status is not a protected class under the FHA or NYSHRL, and (2) the complaint fails to otherwise identify the prospective tenants' race or national origins. *See* Dkt. No. 15-1. In opposition, Plaintiff argues that—consistent with United States Department of Housing and Urban Development ("HUD") guidance and caselaw—a plaintiff may adequately plead discrimination based on race or national origin using evidence of a housing policy employing language-related criteria. *See* Dkt. No. 16. The United States Government has submitted a statement of interest supporting Plaintiff's position. *See* Dkt. No. 19; *see also* 28 U.S.C. § 517.

### III. DISCUSSION

**A.     Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the

claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.* at 570.

**C.   The Fair Housing Act**

The FHA makes it unlawful to (1) "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race ... or national origin"; (2) "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of race ... or national origin"; or (3) "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race ... or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(a)-(c); *see also* 24 C.F.R. § 100.60. Liability may also be established under the FHA "based on a specific policy's or practice's discriminatory effect on members of a protected class under the [FHA] even if the specific practice was not motivated by a discriminatory intent." 24 C.F.R. § 100.500.

7

"To make out a *prima facie* case of disparate treatment under § 3604(a), plaintiffs must show that (1) they are members of a class protected by the FHA; (2) they sought, and were qualified, to rent (or continue renting) the dwellings in question; (3) defendants refused to rent to plaintiffs; and (4) the housing was put on the market or was rented to other tenants." *Khalil v. Farash Corp.*, 452 F. Supp. 2d 203, 207-08 (W.D.N.Y. 2006), *aff'd*, 277 Fed. Appx. 81 (2d Cir. 2008) (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 381 (2d Cir. 1994), *cert. denied*, 513 U.S. 876 (1994)). "'To establish a *prima facie* case [of disparate treatment] predicated upon 42 U.S.C. § 3604(b) the plaintiff[s] must make a modest showing that a member of a statutorily protected class was not offered the same terms, conditions or privileges of rental of a dwelling or not provided the same services or facilities in connection therewith made available to others under circumstances giving rise to a reasonable inference of prohibited discrimination.'" *Id.* at 208 (quotation omitted). As for section 3604(c), a plaintiff "must prove that: (1) [the] defendants made a statement; (2) the statement was made with respect to the rental of a dwelling; and (3) the statement indicated a preference, limitation, or discrimination on the basis of race." *Wentworth v. Hedson*, 493 F. Supp. 2d 559, 565 (E.D.N.Y. 2007). Finally, a *prima facie* showing of disparate impact "requires the plaintiff to '(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two.'" *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (quotation omitted).

**D.    New York State Human Rights Law**

The NYSHRL provides that it is unlawful discriminatory practice to refuse to (1) "sell, rent, lease or otherwise to deny ... any person or group of persons ... a housing accommodation because of the race ... [or] national origin ... of such person or persons"; (2) "discriminate against any person because of race ... [or] national origin ... in the terms, conditions or privileges of the sale, rental or lease of any ... housing accommodation"; or (3) "make any record or inquiry in

8

connection with the prospective purchase, rental or lease of ... a housing accommodation which expresses, directly or indirectly, any limitation, specification or discrimination as to race ... [or] national origin ... , or any intent to make any such limitation, specification or discrimination." N.Y. Exec. Law §§ 296(5)(a)(1)-(3), 296(5)(c)(2).

"'Claims under the FHA and [NYS]HRL § 296 are evaluated under the same framework.'" *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 80 (2d Cir. 2021) (quoting *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014)).

**B.     Analysis**

   *1. Deference to the HUD Guidelines*

Defendants argue that LEP is not itself a protected class, and a refusal to rent on the basis of LEP cannot be treated as a proxy for national origin or race discrimination. Defendants urge the Court not to afford any level of deference to HUD guidance on this issue, arguing that it is "inconsistent with other courts' holdings" and the plain language of the FHA. Dkt. No. 15-1 at 10. In opposition, Plaintiff argues that the HUD guidelines on this issue are entitled to *Skidmore* deference and that language-related housing restrictions may constitute evidence of discrimination on the basis of race and national origin. *See* Dkt. No. 16. The United States Government supports Plaintiff's position, arguing that the HUD guidelines are "thorough, well-reasoned[,] and consistent with applicable caselaw and other HUD guidance" and are therefore entitled to *Skidmore* deference. Dkt. No. 19 at 19.

In *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Supreme Court held that "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (internal citation omitted) (quoting *Skidmore*, 323 U.S. at

9

139). "*Skidmore* deference is a 'more limited standard of deference' than *Chevron* deference," *In re Bernard L. Madoff Inv. Securities LLC*, 779 F.3d 74, 82 (2d Cir. 2015) (quoting *In re New Times Securities Services, Inc.*, 371 F.3d 68, 83 (2d Cir. 2004)), that generally applies to agency interpretations such as "policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Such interpretations "are 'entitled to respect' under [the] decision in *Skidmore* ... but only to the extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (quoting *Skidmore*, 323 U.S. at 140).

In determining whether to defer to an agency's interpretation under *Skidmore*, courts generally first determine whether the statutory language at issue is ambiguous and, where the statute is unambiguous, a court may conclude "that *Skidmore* deference is inappropriate or unnecessary." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Protec. Agency*, 846 F.3d 492, 509 (2d Cir. 2017). Alternatively, a court may choose to "engage in *Skidmore* analysis without answering this threshold question by considering the statutory text as one of several factors relevant to determining whether the agency interpretation has the 'power to persuade.'" *Id.* (quoting *Skidmore*, 323 U.S. at 140). *Skidmore* then "requires consideration of an agency's 'thoroughness, ... the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 227-28 (2d Cir. 2002) (quoting *Skidmore*, 323 U.S. at 140).

HUD is the federal agency statutorily charged with the authority and responsibility for administering the FHA. *See* 42 U.S.C. § 3608. In 2016, HUD issued guidance on "how the [FHA] applies to a housing provider's consideration of a person's [LEP]" and, more specifically, how "the disparate treatment and discriminatory effects methods of proof apply in [FHA] cases in which a housing provider bases an adverse housing action—such as a refusal to rent or renew a lease—on

an individual's limited ability to read, write, speak or understand English." U.S. Dep't of Hous. & Urb. Dev., *Office of General Counsel Guidance on Fair Housing Act Protections for Persons with Limited English Proficiency* 1 (Sept. 15, 2016), https://www.hud.gov/sites/documents/LEPMEMO091516.PDF (hereinafter "2016 HUD Guidance" or the "Guidance").  Ultimately, after examining both caselaw and statistical data, the Guidance concluded that LEP is often used as a proxy for national origin or race discrimination, and that the FHA may therefore be violated by "[s]elective application of a language-related policy, or use of LEP as a pretext for unequal treatment of individuals based on race, national origin, or other protected characteristics." *Id.* at 9.

   The Court finds the 2016 HUD Guidance to be persuasive and entitled to deference.  Initially, it is worth clarifying the Guidance's scope.  Contrary to Defendants' arguments, the Guidance does not assert that LEP alone constitutes a protected class under the FHA.  *See* 2016 HUD Guidance at 1 (acknowledging that "[i]ndividuals who are LEP are not a protected class under the [FHA]").  Rather, the Guidance argues that a housing policy using language-related criteria may be used as evidence of discrimination based on a statutorily protected class—such as race or national origin—for both intentional discrimination and discriminatory effect claims.  *See id.* at 3 ("In [intentional discrimination] cases, the use of the language-related criteria is analyzed under the [FHA] the same as is the use of any other potentially discriminatory criteria. ... 'The key question ... is whether the plaintiffs have presented sufficient evidence to permit a reasonable jury to conclude [they] suffered an adverse housing action' because of their protected class") (quotation omitted); *id.* at 6 ("[W]here a policy or practice that restricts access to housing on the basis of LEP has a discriminatory effect based on national origin, race, or other protected characteristic, such policy or practice violates the [FHA]").

   With the Guidance's limited scope in mind, the Court finds that there is nothing in the

language of the FHA or the associated regulations that prohibits the use of evidence of language-related criteria, such as LEP, as "a proxy or pretext for race or national origin discrimination." *Id.* at 4.  Additionally, the Guidance is consistent with at least one prior HUD pronouncement allowing evidence that a facially legitimate policy was merely a pretextual justification for discrimination under one of the statutorily protected classes.  *See* U.S. Dep't of Hous. & Urb. Dev., *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* 10 (Apr. 4, 2016), https://www.hud.gov/sites/documents/ HUD_OGCGUIDAPPFHASTANDCR.PDF (asserting that the "[s]elective use of criminal history as a pretext for unequal treatment of individuals based on race, national origin, or other protected characteristics violates the [FHA]"); *see also* U.S. Dep't of Hous. & Urb. Dev., *Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 72 Fed. Reg. 2732 (Jan. 22, 2007) ("In certain circumstances, failure to ensure that LEP persons can effectively participate in or benefit from federally assisted programs and activities may violate the prohibition under Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, and Title VI regulations against national origin discrimination").

     The Court also disagrees with Defendants' assertion that the 2016 HUD Guidance is inconsistent "with other courts' holdings."  Dkt. No. 15-1 at 10.  Both *Vialez v. New York City Hous. Auth.*, 783 F. Supp. 109, 124 (S.D.N.Y. 1991) and *Gonazales v. Village Avante Redevelopment, Ltd.*, No. C-84-20525, 1985 WL 1166726, *1 (N.D. Cal. June 24, 1985) involve refusals to affirmatively provide Spanish language assistance to current or prospective tenants—a

very different claim to the one presented here.[3] Indeed, *Vialez* separately addressed a potential disparate impact claim, explicitly noting that "the question to be addressed would be whether those of [the] plaintiff's national origin lose their tenancies as a result of their inability to speak English." *Vialez*, 783 F. Supp. at 124 n.15.[4] Defendants also rely on *Molina v. Aurora Loan Services, LLC*, No. 14-21354-CIV, 2016 WL 11783325 (S.D. Fla. Nov. 4, 2016), which found that the complaint failed "to satisfy the pleading standards of *Twombly* and *Iqbal*" because—rather than stating the plaintiff's actual national origin—the complaint "suggest[ed] only that [the] [d]efendants discriminated against [the plaintiff] based on her inability to speak English." *Id.* at *5. Significantly, however, the intentional discrimination claim in *Molina* is asserted under Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 2000d, *not* under the FHA. Thus, to the extent the *Molina* decision could be read as holding that discrimination on the basis of LEP cannot support a claim of discrimination on the basis of national origin under Title VI, that holding would not be applicable to this case. For similar reasons, the Court is unpersuaded that there is any conflict between the Guidance and the remainder of the cases cited by Plaintiff, all of which involve

---

[3] It is also worth noting that both of these cases were decided over thirty years ago, and their ultimate conclusion—that the defendants did not violate Title VII by refusing to provide translation services—may no longer be valid. HUD has since issued, after notice and comments, guidance that states that the "failure to ensure that LEP persons can effectively participate in or benefit from federally assisted programs and activities may violate ... Title VI regulations against national origin discrimination" and that housing providers may be required to provide "oral and written language services"—*i.e.*, translation services—to current or prospective tenants. U.S. Dep't of Hous. & Urban Dev., *Final Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons*, 72 Fed. Reg. 2732, 2738, 2741 (Jan. 22, 2007) ("HUD Title VI Guidance").

[4] With respect to the disparate impact claim, the *Vialez* court ultimately held that the plaintiff failed to create a material issue of fact because they "produced no evidence to show that Hispanic persons generally are disadvantaged by the [defendants'] English-only forms." *Vialez*, 783 F. Supp. at 124 n.15. Here, Plaintiff has plausibly alleged that Defendants' English language policy disproportionately impacted prospective tenants on the basis of their national origin and race.

employment discrimination claims under Title VI, not FHA housing discrimination claims.[5] *See Trower v. Mount Sinai Hosp.*, No. 16-CV-4322, 2018 WL 4283724 (S.D.N.Y. Sep. 6, 2018); *Broomer v. Huntington Union Free Sch. Dist. Carmen Casper*, No. 12-CV-574, 2013 WL 4094924 (E.D.N.Y. Aug. 13, 2013); *Montalvo v. Cahill*, No. 11-CV-2881, 2011 WL 4943618 (E.D.N.Y. Oct. 12, 2011); *Joseph v. N. Shore Univ. Hosp.*, No. 08-CV-3799, 2011 WL 573582 (E.D.N.Y. Feb. 15, 2011).

Although there does not appear to be any clear authority from the Second Circuit directly addressing whether a language-based policy can be used as evidence of discrimination based on a protected characteristic, the Fourth Circuit has determined that the 2016 HUD Guidance warrants deference and specifically credited the Guidance's proposition that "disparate-impact claims may arise under circumstances in which the challenged policy, on its face, relates to conduct that was not protected under the FHA, but which may correlate with a protected class." *Reyes v. Waples Mobile Home Park LP*, 903 F.3d 415, 432 & n.10 (4th Cir. 2018). As for disparate treatment claims, "'[d]iscriminatory intent may be inferred from the totality of the circumstances,'" and this Court discerns no reason why a "totality of the circumstances" would not include evidence of a language policy being used as a proxy for discrimination on the basis of national origin or race. *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 400 (S.D.N.Y. 2013) (quoting *Regl. Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002)); *see also Yniguez v. Arizonans for Off. English*, 69 F.3d 920, 947-48 (9th Cir. 1995) (noting that "language is a close and meaningful proxy for national origin"), *vacated on other grounds*, 520 U.S. 43 (1997); *Rivera*

---

[5] The Court also notes HUD's Title VI Guidance, which explicitly states that "refusing to serve LEP persons or not adequately serving or delaying services to LEP persons would violate Title VI." HUD Title VI Guidance, 72 Fed. Reg. at 2751; *see also Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1116-17 (9th Cir. 2009) ("Discrimination against LEP individuals [is] discrimination based on national origin in violation of Title VI").

*v. NIBCO*, 701 F. Supp. 2d 1135, 1141 (E.D. Cal. 2010) ("Language-based discrimination is often closely aligned with national origin discrimination, and has been recognized as being worthy of close scrutiny by the courts").

In sum, the 2016 HUD Guidance is well reasoned, thoroughly reviews the relevant case law, and is consistent with the statute and earlier HUD pronouncements. Accordingly, the Court finds the 2016 HUD Guidance to be persuasive and entitled to deference.

### 2. *Allegations of a Specific Race or National Origin*

Defendants argue that, even if the Court affords deference to the 2016 HUD Guidance, "Plaintiff's claims should still be dismissed because the Complaint fails to identify the national origin or race of the prospective tenants, or that Defendants were aware of their national origin or race." Dkt. No. 15-1 at 11; *see also* Dkt. No. 17 at 7-10. In opposition, Plaintiff argues that the complaint "expressly allege[d] that Defendants' language policy was adopted 'with the intent of excluding prospective tenants on the basis of national origin and/or race'" and that the complaint need not allege that Defendants were aware of the race or national origin of particular prospective tenants in order to state a discrimination claim. Dkt. No. 16 at 20 (emphasis omitted).

Initially, Plaintiff does not need to identify the specific national origin or race of particular tenants in order to state a *prima facie* case of discrimination under the FHA. Plaintiff, a nonprofit organization dedicated to eliminating housing discrimination, is an "aggrieved person" within the meaning of the FHA. *See* 42 U.S.C. §§ 3602(d), 3602(i)(1). The fact that Plaintiff used fictitious applicants is not a barrier to Plaintiff's claims because Defendants' "outright refusal" to deal with LEP applicants removes the need for Plaintiff to plead "specific" violations. *Fair Hous. J. Ctr., Inc. v. Allure Rehab. Services LLC*, No. 15-CV-6336, 2017 WL 4297237, *1 (E.D.N.Y. Sept. 26, 2017) (rejecting the defendants' argument that they "could not have violated the [Rehabilitation

15

Act] because there were no actual deaf individuals" because, "[w]here the facility's policy or practice demonstrates a failure to accommodate, specific occurrences of this failure need not be pled");[6] *see also Fair Hous. J. Ctr., Inc. v. Cuomo*, No. 18-CV-3196, 2019 WL 4805550, *13 (S.D.N.Y. Sept. 30, 2019) (holding that the fact that the tester applicants "did not exist ... does not defeat the [plaintiff's] allegations[ ] because it is well established that testers from fair housing organizations can establish violations of the FHA without a formal application to a housing provider") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982)).

Nor is a showing that Defendants were aware of the national origin or race of a prospective tenants required for Plaintiff's *prima facie* case. Initially, neither disparate impact nor discriminatory statement claims require a showing that Defendants were aware of the national origin or race of the prospective tenants. *See Mhany Mgt., Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (holding that a plaintiff establishes a *prima facie* disparate impact case by showing '"(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices'") (quotation omitted); *Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 52 (2d Cir. 2015) (holding that Section 3604(c) is "violated by statements targeted at an individual that convey to an ordinary listener that the individual is [in a protected class]. … [W]hat matters is whether the ordinary listener would understand the statements as considering her as [in a protected class] and expressing discrimination or a preference against her on that basis"). As to Plaintiff's intentional discrimination claim, "[d]iscriminatory intent may be inferred from the totality of the circumstances," even where a housing provider is "not aware of [a plaintiff's] race or

---

[6] Although much of the discussion in *Allure Rehabilitation Services LLC* is in the context of the Rehabilitation Act rather than the FHA, "the standards adopted by the two statutes are nearly identical." *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

ethnicity." *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259, 303 (D. Conn. 2020); *see also* 2016 HUD Guidance at 2-3 (noting that "national origin discrimination can occur even if the defendant does not know, or is mistaken about, precisely from where the plaintiff originates"). In any event, Defendants were, in fact, informed that at least one of the testers was calling on behalf of clients with a different national origin. *See* Dkt. No. 1 at ¶ 23 (asserting that the caseworker informed Butler that her clients had "recently immigrated").

Accordingly, Defendants' motion to dismiss is denied.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 15) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 8, 2022
Albany, New York

/s/ Mae A. D'Agostino
Mae A. D'Agostino
U.S. District Judge